# APPENDIX.

The legislature has authority under the constitution to assess a general tax on the property of the state, for the purpose of distribution, under an act to establish the school mill fund for the support of common schools, approved February 27, 1872.

## On a question proposed by the House of Representatives.

Ordered. That the justices of the supreme judicial court be required to furnish for the information of this house an answer to the following question :

" Has the legislature authority under the constitution of the state to assess a general tax upon the property of the state, for the purposes of distribution, under " An act to establish the school mill fund for the support of common schools," approved February 27, 1872 ? "

BANGOR, February 9, 1876.

Sir :—To the question proposed by the house of representatives, we have the honor to answer as follows :

By the constitution of this state, art. 4, part 3, § 1, the legislature has " full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this state, not repugnant to this constitution, nor to that of the United States."

In the constitution, it is declared that a general diffusion of education is essential to the preservation of the liberties of the people. By its very language, it would seem that the " general diffusion of education " was to be regarded as especially a " benefit " to the people. If so, then the legislature has " full power "

over the subject matter of schools and of education to make all reasonable laws in reference thereto for the " benefit of the people of this state." The power existing, its reasonable exercise, having due regard to the several provisions of the constitution, is subject only to legislative discretion.

The power of taxation " for the defense and benefit of the people " is limited only by the good sense and sound judgment of the legislature. If unwisely exercised, the remedy is with the people. It is not for the judicial department to determine where legitimate taxation ends, and spoliation by excessive taxation begins.

Education being of benefit to the people, and taxation being incidental and essential to its successful promotion, the mill tax, being for educational purposes, must be regarded as constitutional, unless in some other portions of the constitution there be found a clause restricting or forbidding the raising of money by legislative action for educational purposes, thereby limiting the power naturally inferable from § 1, which has been already quoted. The limitation must be upon that section ; for the money being raised, there is no where to be found, an express or implied inhibition of the appropriation of money when raised, to educational purposes.

By article 8, " to promote this important object "—education— " the legislature are authorized, and it shall be their duty to require the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools." But this article is mandatory, not prohibitory.

It imposes duties upon the legislature. It is affirmative, not negative in its character. The legislature cannot avoid the discharge of this duty. It cannot constitutionally absolve the towns from making at their own expense suitable provision for this primary and indispensable foundation of all good government. The legislature are by proper enactments to require the towns to make suitable provision for the support of public schools, and the towns are, at their own expense, to comply with those enactments. Neither can escape from the performance of their several and respective obligations.

But what is making " suitable provision " by the towns, " at

their own expense, for the support and maintenance of public schools?" By whom is the amount for that purpose to be fixed? Not by the towns; for, if left to them, there would be no uniform and definite rule. The "suitable provision" in such case would be a variable quantity, an indefinite and contingent provision, dependent upon the varying wealth of the respective towns and upon the fluctuating views of their voters, or the majority of their voters. It is manifest that a general law upon the subject is required. Accordingly, from the first institution of the government to the present day, the general control of schools, and the determination of what shall be a suitable provision by the towns for their support, has been fixed by legislative enactment. In 1821, by c. 117, § 1, towns were required annually to raise and expend for the maintenance and support of schools therein, "a sum of money, including the income of any incorporated school fund, not less than forty cents for each inhabitant, the number to be computed according to the next preceding census of the state, by which the representation thereof has been apportioned." In the revision of 1840, c. 17, § 6, the amount required was not to be less than forty cents for each inhabitant, the number to be ascertained as in 1821; but this was to be "exclusive of the income of any corporate school fund, or of any grant from the revenue or funds from the state, or of any voluntary donation, devise or bequest, or of any forfeiture accruing to the use of" the town. In the revision of 1857, c. 11, § 5, the amount required was not less than the sum of sixty cents for each inhabitant upon the mode of ascertaining the number of inhabitants, and exclusive of other sources of revenue, as in 1840. In the revision of 1871, c. 11, § 5, not less than one dollar for each inhabitant, to be ascertained as in the two preceding revisions, and subject to the exclusion of all other sources of revenue, whether from the revenue or funds of the state, or from any other source whatever. In 1872 the sum for each inhabitant was reduced to eighty cents.

A "suitable provision" must be one general in its character, and having regard to all the people of the state, in the aggregate. A "suitable provision" is not necessarily a sufficient provision. A sufficient provision must be one adequate to meet the educa-

tional demands of the people. It may therefore become necessary to supplement what is a suitable provision by adding thereto what will make it a sufficient one. Have, then, the legislature the right to do this? There is no express prohibition to their so doing. The right to do so exists by art. 4, p. 3, § 1, and no prohibition to the contrary is to be found in art. 8.

By recurring to the debates of the convention by which the constitution was framed, it will be seen that it was anticipated that state aid was to be granted for the support of schools, in addition to the suitable provision to be required by art. 8, of towns. In considering the question presented for our opinion, the views of the framers of the constitution and the subsequent practical construction of its provisions are entitled to much weight. Perley's Debates, 206, 207. It will be seen by recurring to the legislature of the state that what was expected to be done was done, and that right speedily.

In 1828, c. 403, "an act providing for the support of education" was passed. By this act twenty townships were to be sold, and the avails were to constitute a permanent fund to be reserved for the benefit of primary schools. At the same time, and by the same act, any moneys arising from the Massachusetts claim, so called, after paying the debts of the state, were to be added to the school fund. Now whether the lands of the state, or the moneys of the state are appropriated for the benefit of the primary schools, can make no difference in principle. In either event, the "suitable provision" established by the legislature is supplemented by the funds of the state.

In 1850, twenty-four half townships of the undivided lands of the state were reserved, the proceeds to be "appropriated as a permanent fund for the benefit of common schools."

In 1833, c. 82, with the exception of one thousand dollars for Parsonsfield Academy, the tax on the several banks in the state was "appropriated to the support of primary schools."

It will thus be perceived that a school fund in addition to, and in aid of, the "suitable provision" required by the constitution, derived from various sources, and acquired at different times, was established, almost contemporaneously with the existence of the

state, and has continued to the present time. It matters not, whether this fund was derived from the sale of the lands of the state, from taxes on its chartered banks, from state funds already in the treasury, or to be raised by taxation upon the real and personal estate of its inhabitants. Neither does the general expediency of this legislation as regards the well being of schools, nor whether due provision has been made to guard the funds thus acquired from being diverted from the object for which they are raised, affect the question of constitutionality. It is for the legislature to provide the necessary security that the bounty of the state be not misapplied, and to impose sufficient penalty in case of its misapplication.

The tax in question is like that for the support of government. It is for the benefit of the whole people. All the property in the state is assessed therefor according to its valuation. All contribute thereto in proportion to their means. It is a tax for a public purpose, not one, by which one individual is taxed for the special and peculiar benefit of another. All enjoy the beneficial results of education, and the better order and government arising therefrom, irrespective of the amounts respectively contributed by each to these most important objects.

All acts of the legislature are presumed to be constitutional till the contrary is clearly shown. No court will declare an act unconstitutional, when its constitutionality is a matter of doubt.

In relation to the question proposed, we answer that the legislature has authority under the constitution to assess a general tax upon the property of the state for the purpose of distribution under "An act to establish the school mill fund for the support of common schools," approved February 27, 1872.

JOHN APPLETON,

C. W. WALTON,

J. G. DICKERSON,

WILLIAM G. BARROWS,

CHARLES DANFORTH,

WM. WIRT VIRGIN,

JOHN A. PETERS,

ARTEMAS LIBBEY.

The governor and council, in the performance of their duty to ascertain what county officers are elected at the general election in September, can not lawfully count the votes of a town, the return of which bears the proper signature of one of the selectmen, and the names of the two other selectmen written by other hands than their own.

Nor in such case can they lawfully count the votes of a town, the return of which is not attested by the town clerk.

*On questions proposed by the executive council.*

" Ordered. That the opinion of the supreme judicial court be requested on the following questions:

" I. Can the governor and council, in the performance of their duty to ascertain what county officers were elected at the general election in September, lawfully count the votes of a town, the return of which bears the proper signature of one of the selectmen, and the names of the two other selectmen written by other hands than their own?

" II. Can the governor and council, in the performance of their duty in counting the votes for county officers, lawfully count the votes of a town, the return of which is not attested by the town clerk?"

BANGOR, Dec. 22, 1877.

The undersigned, justices of the supreme judicial court, have the honor to submit the following answer to the interrogatories proposed:

Wherever the constitution or the statutes of the state requires the official signature of a public officer, he must personally affix his signature or mark. This duty cannot be executed by attorney or delegated to another. By R. S., c. 1, § 4, rule 18, " the words ' in writing ' and ' written' include printing and other modes of making legible words. When the signature of a person is required he must write it or make his mark." In *Chapman* v. *Limerick*, 56 Maine, 390, this question came before the court. Mr. Justice Kent, in delivering the opinion of the court, says : " It requires no argument to show that it was never in the contemplation of the law makers, that official certificates or returns, which the law requires of those holding certain offices, might be signed by

attorney or agent, or that they could have any legal validity, unless signed by the officers so that they should bear his own hand-writing." The selectmen are required to sign the returns, but if all save one were permitted to sign by attorney, there would be no reason why the same permission should not be extended to all, and if this were allowed there might be returns counted to which none of the officers have affixed their signatures as required by law.

It is to be regretted that votes are lost by the negligence or ignorance of town officers, but the obvious remedy is to choose such as know their duty, and knowing it, will legally perform it.

To the first question proposed we answer in the negative.

The town clerk is the recording officer of the doings of the town, and without his attestation there is no legal evidence that any vote has been cast. His attestation is a prerequisite, to any action on the part of the governor and council in counting votes.

Indeed, the power of the governor and council in relation to the proof upon which they are authorized to act is confined to legal returns duly transmitted, except in the special cases where enlarged powers have been conferred by statute. 64 Maine, 590.

The second question proposed we answer in the negative.

JOHN APPLETON,
C. W. WALTON,
J. G. DICKERSON,
WILLIAM G. BARROWS,
CHARLES DANFORTH,
WM. WIRT VIRGIN,
JOHN A. PETERS,
ARTEMAS LIBBEY.

The treaty concluded at Washington, August 9, 1842, confers the elective franchise on the subjects of the queen of Great Britain, residing on the disputed territory in the north-eastern portion of the state, at the time of the treaty and not otherwise naturalized.

Persons born on the disputed territory within the present limits of this state have the same elective franchise as persons born on territory within the state over which the British government made no claim.

*On a question proposed by the senate, February* 16, 1878.

Ordered. That the justices of the supreme judicial court be requested to give their opinion on the following question ; and in case it is found impracticable to give such opinion before the adjournment of the present legislature, to report the same to the governor, to be by him promulgated :

" Question. Does the treaty concluded at Washington, August 9th, 1842, for the purpose of determining the boundaries between the territories of the United States and the possessions of Her Britannic Majesty, in North America, confer the elective franchise on foreign born persons residing on the disputed territory in the north-eastern portion of this state, at the time of the treaty, and not otherwise naturalized ? "

BANGOR, February 25, 1878.

To the question proposed, we have the honor to answer as follows:

The preamble to the treaty of Washington recites that " certain portions of the line of boundary between the United States of America and the British dominions in North America, described in the second article of the treaty of peace of 1783, have not yet been ascertained and determined, notwithstanding the repeated attempts, which have been heretofore made for that purpose; and whereas it is now thought to be for the interest of both parties, that avoiding further discussions of their respective rights in this respect, under said treaty, they should agree on a conventional line in said portions of the said boundary, such as may be convenient to both parties, with such equivalents and compensations as are just and reasonable."

It is obvious that there was no definite and ascertained boun-

dary on that part of the line which divided the territory of the
United States from the province of New Brunswick; for the first
article of the treaty defines and establishes the boundary by a
conventional line.   The boundary as described in the treaty of
1783 gives place to a new and conventional line for agreeing to
which there are to be such equivalents and compensations " as are
deemed just and reasonable."   The preamble to the treaty con-
cedes that no line had been " ascertained and determined."
It ignores the line of 1783 and establishes a new one.   The line
thus agreed upon is the line established by the treaty.   It is the
line and the only line recognized by both nations.   Whatever
portion of the disputed territory which had been under the juris-
diction of one government and became by the conventional line
the acknowledged territory of the other, is territory acquired by
the treaty, the right to which was thereby first and conclusively
determined.

This view is further confirmed by the fourth article of the
treaty, which provides that " all grants of land heretofore made
by either party within the limits of the territory, which by this
treaty falls within the dominions of the other party, shall be held
valid, ratified and confirmed to the person in possession under
such grants to the same extent as if such territory had by this
treaty fallen within the dominions of the party by whom such
grants were made."   If, as the treaty admits, the line between the
two countries from the monument to the river St. John had not
been " ascertained and determined," whatever territory falls
within the United States by the line agreed upon by the treaty of
Washington, becomes by that treaty the territory of the United
States, though it had previously been in the occupation of and
under the jurisdiction of the British government.   The jurisdic-
tion of each government till changed by the treaty is acknowl-
edged and its grants are confirmed.   *Little* v. *Watson*, 32 Maine,
214.   The rights of each party, as to the boundary line, are for
the first time determined, and they are fixed and determined by
this treaty alone.

No line having been previously " ascertained and determined,"
the conventional line thus agreed upon fixes the portion of the

disputed territory which each party shall acquire under the treaty. So far as it may have been under foreign jurisdiction, the right of such foreign government is now ceded to and acknowledged to be in that of the United States. Each nation cedes so much of its territory to the other as falls to the share of such other in accordance with the new line.

The territory in question being acquired by treaty, the government transferring it ceases to have any jurisdiction over it. It no longer owes protection to those residing upon it, and they no longer owe it allegiance. The inhabitants residing upon the territory transferred have the right of election. They may remove from the territory ceded if they prefer the government ceding the territory. If they elect to remain, their allegiance is at once due to the government to which the cession has been made, and they are entitled to the corresponding right of protection from such government. From being subjects of the queen of Great Britain they become citizens of the United States. The inhabitants of territory ceded from one government to another are collectively naturalized, and have all the rights of natural born subjects by mere force of the cession of the soil without the necessity of anything being expressed to that effect. Westlake Private International Law, 28. Thus, all persons who were citizens of Texas at the date of annexation became citizens of the United States by virtue of the collective naturalization effected by the joint resolution of congress of March 1, 1845, though no allusion to citizenship is found therein. These views, whenever the questions discussed have been involved, have been uniformly sustained. 13 Opinions of Attorneys General, 397.

By "foreign born persons," we understand are meant the inhabitants residing upon the disputed territory, subjects of the queen of Great Britain and owing allegiance to her, who by the treaty are now within the jurisdiction of the United States and subject to the government of Maine. Persons born within the actual territory of the state can hardly be regarded as "foreign born," and, if born within the territory of Maine under the temporary jurisdiction of a foreign government, their rights as American citizens would not be affected by such temporary jurisdiction, but upon its termination would be revived in full force.

We answer, therefore, that the treaty concluded at Washington, August 9, 1842, confers the elective franchise on the subjects of the queen of Great Britain residing on the disputed territory in the north-eastern portion of the state, at the time of the treaty and not otherwise naturalized.

> JOHN APPLETON,
> C. W. WALTON,
> J. G. DICKERSON,
> WILLIAM G. BARROWS,
> CHARLES DANFORTH,
> WM. WIRT VIRGIN,
> JOHN A. PETERS,
> ARTEMAS LIBBEY.

*On a question proposed by the senate, February* 19, 1878.

Ordered. That the justices of the supreme judicial court be requested to give their opinion upon the following question, in addition to the question asked in the order passed by the senate on the 16th instant, and to report the same to the governor, to be by him promulgated, to wit :

" Whether persons born upon said disputed territory within the present limits of this state, have or not the same elective franchises as persons born upon territory within the state over which the British government made no claim ? "

BANGOR, March 11, 1878.

To the question proposed, we have the honor to answer as follows :

The territory in question belonged of right either to the jurisdiction of the government of Great Britain or to that of the United States.

If to the government of Great Britain, then its cession to that of the United States transferred the territory and the inhabitants residing thereon subjects of that government, who chose to remain, to the jurisdiction of the United States with all the rights of citizenship.

If the disputed territory belonged to the United States, then

the jurisdictional occupation of territory by a government to whom it does not rightfully belong ceasing, the latent right of the rightful government at once revives. The restoration by treaty, of territory wrongfully or erroneously occupied to its rightful sovereign carries with it by its silent operation the restoration of all rights of persons, which may have been in abeyance.

In other words, persons born upon the disputed territory within the present limits of this state have the same elective franchises as persons born upon territory within the state over which the British government made no claim.

JOHN APPLETON,
C. W. WALTON,
J. G. DICKERSON,
WILLIAM G. BARROWS,
CHARLES DANFORTH,
WM. WIRT VIRGIN,
JOHN A. PETERS,
ARTEMAS LIBBEY.

———

IN COUNCIL, February 12, 1878.

Ordered. That the opinion of the supreme judicial court be requested on the following questions:

" I. Is a person found in an unincorporated place, in need of relief, having no home or place of residence in said unincorporated place, but being there for some temporary purpose only, within the meaning of section twenty-two, chapter twenty-four, of the revised statutes ?

" II. If such person is relieved by the oldest adjoining incorporated town, and he has no legal settlement in the state, and he has not lived in the town furnishing relief, is such town entitled to be reimbursed by the state for the relief furnished under the statute aforesaid, and act of 1874, chapter two hundred and thirty ? "

BANGOR, June 20, 1878.

I have the honor to announce the following answers as the opinion of a majority of the justices of the supreme judicial court on the questions proposed:

I. A person found in an unincorporated place, in need of relief,

having no home or place of residence in such unincorporated place, but being there for some temporary purpose only, is not within the meaning of section 22, chapter 24, of the revised statutes.

II. If such person is relieved by the oldest adjoining incorporated town, and he has no legal settlement in the state, and he has not lived in the town furnishing such relief, such town is not entitled to be reimbursed by the state for the relief furnished under the statute aforesaid, and act of 1874, chapter 230.

JOHN APPLETON,
Chief Justice of Sup. Jud. Court.

IN COUNCIL, February 15, 1878.

Ordered. That the opinion of the justices of the supreme judicial court be requested on the following questions:

" Is a trial justice or a justice of the peace and quorum to be considered a justice of an inferior court, under the provisions of section two, of article nine, of the constitution of this state?

" Can a register of deeds properly be commissioned by the governor as a trial justice or a justice of the peace and quorum? "

BANGOR, June 20, 1878.

I have the honor to announce the following answers as the opinion of the majority of the justices of the supreme judicial court :

I. A trial justice or a justice of the peace and quorum is not to be considered a justice of an inferior court, under the provisions of section 2, of article 9, of the constitution of the state.

II. A register of deeds can properly be commissioned by the governor as a trial justice or a justice of the peace and quorum.

JOHN APPLETON,
Chief Justice of the Sup. Jud. Court.